Youngblood vs. The State.

---

## YOUNGBLOOD VS. THE STATE.

35  35
71  55

35  35
73  497

1. CRIMINAL PRACTICE: *Appeal: Suspending judgment.*
   It is the duty of the circuit court, when asked, to suspend the execution of a judgment against a defendant in a criminal case, for a reasonable time, for him to apply to a judge of the supreme court for an appeal and supersedeas, as provided by law.

2. VERDICT: *General, on several counts.*
   When an indictment for murder contains several counts, alleging variously the means of death, the jury may render a general verdict.

3. EVIDENCE: *Statement of prisoner to officer.*
   Voluntary statements of a prisoner, though made to an officer, and while he was in custody, are admissible in evidence against him.

APPEAL from *Franklin* Circuit Court.

Hon. W. D. JACOWAY, Circuit Judge.

*Henderson, Attorney General,* for the State.

ENGLISH, C. J.    In November, 1879, Cal Emory and James Youngblood were jointly indicted in the circuit court of Franklin county for murder.

They were charged with murdering *Mary E. Taylor,* on the seventh of July, 1878, in said county.

The indictment contained seven counts, alleging variously the means of death.

The *first count* charged that they murdered her by stabbing her with a knife.

The *second,* by striking, beating, wounding and bruising her with clubs.

The *third,* by striking, beating, wounding and bruising her with their fists.

The *fourth,* by striking and beating her with stones.

The *fifth,* by throwing her into water and drowning her.

The *sixth,* by stabbing her with knives; and by beating her with their fists; and by beating and wounding her with clubs; and by beating, wounding and bruising her with stones; and by throwing her into water and drowning her.

The *seventh,* killing and murdering her by some means, instruments and weapons to the grand jurors unknown.

Each count alleged the time and place of the offense, and employed the technical words requisite and usual in an indictment for murder in the first degree.

Both defendants entered a general demurrer to the whole indictment, which the court overruled. They elected to sever. Youngblood was tried on the plea of not guilty. The jury found him guilty of murder in the second degree, and fixed his punishment at imprisonment in the peniten-

Youngblood vs. The State.

tiary for twenty-one years. He filed motions in arrest of judgment and for a new trial, which were overruled, and he took a bill of exceptions. He was sentenced upon the verdict, and prayed an appeal, which was allowed by one of the judges of this court.

I. At the time appellant was sentenced (the eleventh of December, 1879), he moved the court to suspend the execution of the judgment, and allow him sufficient time to obtain a transcript of the record, and submit the same to one of the judges of the supreme court for the allowance of an appeal, etc., which motion the court overruled. At what time the execution issued, does not appear. The clerk's certificate of authentication to the transcript bears date the seventh of January, 1880, and the appeal was allowed on the twenty-seventh of the same month, before which time, it seems, appellant had been lodged in the penitentiary, and the allowance of the appeal did not operate as a supersedeas.

*1. Criminal Practice: Appeal: Suspending judgment in circuit court.*

On the thirtieth of January appellant's counsel moved this court for an order to remand him to the jail of Franklin county, that he might there remain until his appeal could be heard and determined, as he would have done had the court below suspended the execution until he obtained the allowance of the appeal, and had a certificate thereof sent to the clerk below, etc.

This motion was overruled because there is no law providing for such an order, and no precedent for it.

By statute, if appellant is confined in the penitentiary before the certificate of the allowance of the appeal is delivered to the sheriff, he must remain there during the pendency of the appeal. *Gantt's Dig., sec. 2134.*

*Sec. 2120 Gantt's Dig.* provides that: "Upon an appeal being prayed, the circuit court shall grant to the defendant

a reasonable time for obtaining a transcript of the record, for submitting the transcript to a judge of the supreme court for his allowance of the appeal, for filing the same in the clerk's office of the supreme court, and obtaining the certificate of appeal."

Why the court below did not suspend the execution of the judgment for a sufficient time to enable appellant to apply for an appeal and supersedeas, as provided by the statute, does. not appear.

But such an error occurring after the judgment is no ground for its reversal.

II. The demurrer was general to the whole indictment, and, in short, upon the record by consent.

2. VERDICT: General; on several counts, good. The motion in arrest of judgment was upon two grounds: First—That the indictment does not charge any public offense known to the law; and, second—because the jury, in their verdict, did not state upon which count of the indictment they found defendant guilty.

No particular objection to the indictment is pointed out, and we can see no substantial defect in it; and the jury had the right to render a general verdict. *Howard v. The State, 34 Ark., 433; Edmonds v. The State, 34 Ark., 720.*

III. In the motion for a new trial are the usual grounds that the verdict was wholly unsupported by the evidence, and was against law and the instructions of the court.

The death of Mary E. Taylor was proved beyond a reasonable doubt, by the finding and identification of her remains, and there were some indications that her death was caused by violence. The criminal agency of appellant rested upon circumstances, and upon his own statements.

Mary E. Taylor was married at the house of her brother, Starling Dabbs, in Franklin county, some seven years before her death, and went with her husband to Missouri,

where, from some cause not appearing, they separated, and she returned, and had been living at her brother's house for two years before her death.

On Sunday morning about 8 o'clock, July 7, 1878, she left the house to go to John George's, who lived about a mile east, up Mulberry creek, near its bank, and on the same side of the creek on which Dabbs lived.   Members of the family testified that she was in good health and spirits, looking unusually well, of sound mind;   her front teeth above and below were in her mouth and in an apparently sound condition, and she wore a light brown calico dress and checked sun-bonnet when she left the house on that morning.

Failing to return as soon as she was expected by the family, an uneasiness grew up, the neighbors were alarmed, and a general search was made for her.

On Saturday, the thirteenth of July, her bonnet was found hanging on a bush, on the bank of the creek, near the water's edge; and her rings, which she wore when she left the house, were tied to the bonnet-strings.   The water in the creek at this place was twelve or fourteen feet deep, and ran slowly.   When she left the house, she went eastward, in the direction of the place where the bonnet was found.

On Monday, July 15th, her body (or its remains) was found in a slough, about three-quarters of a mile west of the house, and about a mile and a quarter from the place where the bonnet was found.   The body was in still water about ten inches deep.   The place where it was found was wild and unfrequented, no habitation being nearer than three-quarters of a mile.   A thicket of underbrush extended across the slough below the body.   At the head of the slough was a bar over which the water was running

from four to six inches deep into it, from the creek, and flowing back into the creek below, through an unobstructed channel about ten or twenty steps above the place where the body was found. The slough was on the south side of the creek, and its deepest part probably about two feet. It went off from the creek in a southwesterly direction, and curved back into it some two or three hundred yards from its head. The feet of the body were up stream, the head down, skirts forward over the body as if washed up, and the legs exposed. The flesh was gone from the face, the scalp off, with the hair in it lying near the head, the entrails out and the body swollen and offensive Seven of the upper and lower front teeth were missing. There were several slits or cuts in her dress over, above and below the breast, and maggots were working out of the holes. There was a pole by the side of the body, its lower end in the underbrush and upper end in the eddy water, which appeared to have floated there with the drift.

Members of the family identified the remains as those of Mary E. Taylor, by her clothing, shoes, hair, etc.

Some time after the remains were buried, and after the flesh had all decayed, they were exhumed under the order of a magistrate, and the skeleton examined by medical witnesses. They found no fracture of any of the bones except a fracture of the eighth rib on the left side, which fracture was about an inch from the spinal column. Around the fracture they discovered signs of coagulated blood, which must have settled there immediately before or after death. They were of the opinion that the fracture of the rib and the settling of coagulated blood, about the fracture, were caused by violence shortly before or immediately after death.

A dentist, who aided in this examination, testified that

he had operated upon the teeth of Mary E. Taylor about
two months before her death, at which time the front teeth
in her upper and lower jaws were in a sound condition.
At the *post mortem* examination, three of her upper and
four of her lower front teeth were found missing. Three or
four months before her death he had extracted three of
her molar or jaw teeth, and corresponding vacancies were
found in the skull. He had also filled some of her teeth
with amalgam, which he identified as yet in the skull.

The above, in substance, was the proof, on the trial, of
the *corpus delicti.*

From various facts stated by a majority of the witnesses
as to the course of the current of the creek, obstructions
in it, the bar at the head of the slough, and the shallow-
ness of the water passing over the bar into the slough, it
seems doubtful whether the body of Mrs. Taylor could
have floated down the creek from the place where her bon-
net was found, and entered the slough over the bar at its
head, at which point the current of the creek turned
towards its north bank. It seems from the testimony of
other witnesses that there was a rise in the creek of about
two feet between the seventh and fifteenth of July, and
that the body might have been floated in the slough on
such rise. What the jury concluded about this we do not
know.

About the time the body was found, Cal. Emory, who
had taken some part in the search, disappeared from the
neighborhood. About a month after, appellant, who, in
the meantime had been making efforts to sell his crop, and
manifested uneasiness, disappeared, and they were both
afterwards arrested in Sharp county.

Emory had been visiting Mrs. Taylor, at her brother's
house, from May, 1878, down to within a few days of her

death, and, to use the language of her brother, "*sparking her*," though she had not been divorced from her husband. She received his visits and associated with him.

During the search Emory and appellant were several times seen together in consultation, and the former was attempting to borrow money, offering the latter as surety. Emory lived at the house of Richard F. Huggins, and was not there on Sunday, the seventh of July. Appellant lived with James M. Huggins, and made a crop on his place, but was not there on that Sunday.

After the body was found, appellant was attempting to sell J. W. Childress his crop, but said he did not want to be in a hurry about it, as it might raise a suspicion against him.

Emory and appellant staid at the house of appellant's father the night of the sixth of July. On the next morning (Sunday, the seventh of July,) they left there together when the sun was about a half hour high. Emory asked appellant to go with him over to his home at Richard F. Huggins', and they took their hats and started off in an easterly direction. It was about a mile and a half or two miles from the house of appellant's father to the house of Richard F. Huggins, and both of them lived on the south side of Mulberry creek, and in the neighborhood of Starling Dabbs, brother of Mrs. Taylor.

After the body was found, appellant stated to H. J. Randall that he and Emory went from his father's house to Richard F. Huggins', and from there to James M. Huggins', and from there to Oliver's on Sunday morning, the seventh of July, 1878. There was testimony conducing to prove this statement to be false.

There was a school-house about two and a half miles, in a southerly direction, from the place where the bonnet was

found, and there was an appointment for singing and preaching there on Sunday, the seventh of July, 1878.

After some people had assembled, appellant came there on foot, and inquired of a witness if he had seen Emory, and he replied that he was in sight, coming up the road. Appellant started off, and met Emory about twenty yards from where the people were collected, and they went into a hollow, out of sight; remained there about fifteen minutes, and then returned to the church. It was a warm day; appellant had on thin clothing, and they were wet with sweat. The appointment for singing was at 9 o'clock, but what time appellant and Emory got there, does not appear. Emory's clothes were also wet with sweat.

William L. Huggins testified that within a week after the body of Mary E. Taylor was found, appellant came to him, at the church house, and stated to him that he supposed that Emory had told him "about their meeting with that woman at the creek on that Sunday morning." Witness replied that he had, and appellant remarked "that he, (Emory) was a damned fool for ever saying anything about it."

Robert Case, sheriff of Independence county, who arrested appellant in Sharp county, testified that on their way to Batesville appellant voluntarily told him that he and Emory had an understanding by which Emory was to meet deceased at a certain place on Mulberry creek, in Franklin county, on Sunday morning, and that he (appellant) was to come up on them and catch them in the act of sexual intercourse, and demand a participation in the same himself; that he accordingly went to the place at the appointed time, and saw Emory and the deceased having sexual intercourse; that he approached, and asked her to yield to him, but that she refused, and said she would die

first; and that he and Emory then left her, and went on together to the church house; and on the way Emory stopped at a branch and washed the blood out of his handkerchief, when he (appellant) remarked to Emory, "You had a rough job of it;" to which Emory replied, "Yes," etc.

After making this statement, appellant offered witness his horse and crop if he would turn him loose.

Appellant appeared to desire to turn state's witness, and repeated the above statement several times, but never would make any further disclosure.

Frank P. Southard, of Independence county, testified that in a conversation he had with appellant, about the twelfth of November, 1878, appellant asked him if Emory had heard about the reports concerning Mrs. Taylor in Franklin county. Witness told him he had, and appellant said nothing would ever be done about it, as the woman was a damned "*whore*," and had no friends that would take it up. In a second conversation witness had with appellant about this matter, he said Mrs. Taylor was a perfect lady and a virtuous woman.

A. J. Nichols, deputy sheriff of Franklin county, testified that about the middle of August, 1878, he went to Batesville after Emory and appellant; Sheriff Case took appellant out of jail into the court yard, where he conversed with him, after which Southard asked witness, in the presence of appellant, if there was any danger of the prisoner being mobbed in Franklin county, and witness told him but few persons knew anything about it, and there was no danger; they afterwards went into the jail, and appellant asked witness how public sentiment relative to the matter was in Franklin county; witness replied that but little was known of the matter, but it was worse against

Emory than him; witness told him what he had understood William L. Huggins would testify, and appellant then said, "God knows I am not guilty as charged;" witness told him he was glad to hear it; after he was put into the cell, and witness was about to leave, appellant caught hold of him, and said he wanted to talk to him; witness stepped back with him, and, when they were alone, told him he wanted to ask him some questions, and if he answered him at all he wanted him to tell him the truth, and if he could not do this he need not answer; witness then asked him, *first:* "Did you and Emory commit an outrage on Mary E. Taylor?" *second:* "Did you and Emory outrage Mary E. Taylor and murder her and throw her in the creek?" to which appellant replied: "Jack, I did not help to throw her in the creek; I did not see that; I did not know anything about that."

He did not answer any further, but said he would rather see a lawyer first, and if witness would come back that evening about sundown, he would see further about it. About sundown that evening witness was again at the jail, and asked appellant if he wanted to answer any questions, and he replied he believed he would not answer them.

The foregoing are, in substance, the leading circumstances and statements tending to connect appellant criminally with the death of Mary E. Taylor. The transcript discloses other slight circumstances and statements, which, in the minds of the jurors, who doubtless understood the local surroundings better than we do, might have had such tendency, but we deem it unnecessary to attempt to state them.

Upon the whole of the evidence, the question of the guilt or innocence of appellant was for the jury. Their

verdict shows what their judgment was upon the facts, and the presiding judge, who heard all the evidence, refused to set it aside.

In *Liles v. The State, 30 Alabama, 24,* the accused was convicted of murder on slighter statements connecting him with the crime than were proved to have been made by appellant in this case, and the supreme court, after holding that such statements were admissible, as tending to prove the guilt of the accused, and that their weight was matter for the jury, affirmed the judgment.

From all the indications in the transcript, the penitentiary is a more appropriate place for appellant than in a civilized community.

It is not improbable that Mary E. Taylor was outraged, murdered and put into the creek, and her bonnet hung on a bush, and her rings tied to its strings, to make the impression that she had committed suicide by drowning herself. If she voluntarily yielded to the solicitations of Emory. why did he have a rough job of it? and why was there blood on his handkerchief? By the statement of appellant to Case, if true, he and Emory left her at the same time, and appellant must have been present when she was put into the creek, if put in by violence before they left her. He, in effect, admitted to Nichols that she was outraged, but denied that he saw her murdered and thrown into the creek. It was for the jury to get at the truth, as best they could from all of his statements, and from the circumstances in evidence. If he was present, aiding, abetting, encouraging, or consenting, when she was murdered and put into the creek by Emory, and if such was the fact, he was a principal in the crime, as the court charged the jury.

IV. Appellant objected to the admission of the evidence of his statements as made to Case and Nichols on the ground that they were not voluntarily made; the court overruled the objection, and this is made, in different forms, the fifth, sixth and seventh grounds of the motion for a new trial.

3. EVI-
DENCE:
Voluntary
confessions
of prisoner
to officer
admissible.

The statements appear to have been voluntarily made, and though made to officers, when appellant was in custody, they were properly admitted in evidence. *Meyer v. The State, 19 Ark., 156. Austin v. The State, 14 ib., 556.*

V. The fourth ground of the motion for a new trial is, that the court erred in excluding the testimony of John R. Fisher, a witness on the part of defendant.

The bill of exceptions shows that after this witness had testified about the depth of the creek, etc., defendant offered to prove by him "that he knew the general reputation of Mary E. Taylor for sanity and insanity before her death—that she had the general reputation of being a woman of sane mind, but that he had heard some persons, a minority of her neighbors, express themselves as believing her to be of unsound mind;" which the court excluded.

That defendant offered to prove by the same witness "that the oldest sister of Mary E. Taylor, to-wit: Winnie Ann Dabbs, is and has been insane for a number of years;" which the court excluded.

If it was competent to prove by general reputation that Mary E. Taylor was insane, what some of her neighbors, a minority of them, said about her, would not be general reputation.

The fact that her sister had the misfortune to be insane was no evidence of her insanity.

If she was insane, the statement of appellant that he and Emory had made arrangements to have intercourse

with her was the more shocking; and if they, or either of them forced her, it was the more brutal; and if they murdered her, her insanity enhanced, rather than mitigated the enormity of the offense. If she was insane, why would she drown herself from any sense of shame, which seems to have been the theory of this attempted feature of the defense.

VI. The remaining grounds of the motion for a new trial relate to the ruling of the court in giving and refusing instructions.

On behalf of the state, the court gave twenty-six instructions, to most of which appellant objected, and some of which were really needless, though they seem to have been harmless.

Appellant moved eight objections, of which the court gave those numbered 2 and 3, and refused the others, but gave two (numbered 27 and 28) in lieu of such as were not substantially embraced in instructions given for the state.

The instructions given by the state were very much of the same character as those given in the case of *Edmonds v. The State, 34 Ark., 720*, though in this case there was no question about the surname of the deceased, and appellant did not think proper to put his character in issue, hence there was no instructions on these subjects.

It must not be expected that we can take the time, or do the labor of copying and commenting on the instructions, taken in substance from the provisions of the statutes, or the text-books, opposed by sweeping objections, and followed up by no brief here pointing out specific objections to any of them.

Upon the whole we think the instructions given submitted the case fairly to the jury upon the evidence.

Affirmed.